UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

                v.

EDDIE ORTIZ-ORTIZ,

                Defendant.

1:20-CR-00161-JLS-MJR

REPORT, RECOMMENDATION
AND ORDER

This case was referred by the presiding judge, the Honorable John L. Sinatra, Jr., to this Court, pursuant to 28 U.S.C. §636(b)(1), to handle non-dispositive discovery motions and to make a recommendation as to all suppression motions. Before the Court are omnibus motions by defendant Eddie Ortiz-Ortiz ("defendant"), including motions to suppress evidence and various discovery demands. (Dkt. No. 22). For the following reasons, it is recommended that defendant's motions to suppress be denied. The Court's decisions as to defendant's various discovery demands are also set forth in detail below.

## BACKGROUND AND PROCEDURAL HISTORY

On October 14, 2020, a grand jury returned a single-count Indictment charging defendant Eddie Ortiz-Ortiz with possession with intent to distribute 500 grams or more of a mixture and substance containing cocaine, in violation of Sections 841(a)(1) and 841(b)(1)(B) of Title 21 of the United States Code. (Dkt. No. 13).

Defendant has filed omnibus motions seeking, *inter alia*, suppression of physical evidence seized from a vehicle pursuant to a search warrant, suppression of custodial statements, suppression of evidence gained from defendant's warrantless arrest, and

suppression of derivative evidence. (Dkt. No. 22). The Government filed a response to defendant's motions. (Dkt. No. 25). An evidentiary hearing was held before the Court on May 4, 2021 which included the testimony of Special Agent David Walters of the Drug Enforcement Administration and Deputy Joseph Yerpe of the Cattaraugus County Sheriff's Department. (Dkt. No. 109). The hearing was continued to May 11, 2021, at which time defense counsel advised the Court that it rested. (Dkt. No. 31).

The Government and defendant filed post-hearing briefs. (Dkt. Nos. 40; 41). Oral argument was held before this Court on January 7, 2022, wherein each party rested on their papers. At that time, the Court considered the matter submitted for decision.

## FINDINGS OF FACT

During the hearing on May 5, 2021, the Court heard testimony from Special Agent David Walters of the Drug Enforcement Administration ("DEA") and Deputy Joseph Yerpe of the Cattaraugus County Sheriff's Office ("CCSO"). (Dkt. No. 33). Their testimony related to events that occurred on January 31, 2021; more specifically: (1) the delivery of a suspicious package to an address in Salamanca, New York; (2) the stop and search of a vehicle that defendant was driving; and (3) the post-arrest interviews of defendant. (Id.).

On January 29, 2020, Agent Walters received information from Inspector Josh Burch at the United States Postal Inspection Service ("USPIS") regarding a suspicious package arriving from Puerto Rico and addressed to "90 River St., Salamanca, NY 14779." (Tr. 7; Ex. 1).[1] The package had an anticipated delivery date of January 31, 2020. (Tr. 8). USPIS conducts investigation into illegal contraband and narcotics that are being transported through the postal system. (Tr. 8). USPIS regularly works with DEA in

---

[1] Citations to "Tr." refer to the transcript of the evidentiary hearing. (Dkt. No. 33).

handling investigations of crimes under Title 21 of the United States Code. (Tr. 8, 56). When Inspector Burch contacted Agent Walters about this package, he noted that the sender's name on the package ("Luis Delgado") and the writing on the label were consistent with previous packages that had been seized and found to contain cocaine. (Tr. 8, 59-60). Despite being identified as suspicious, law enforcement did not open the package prior to its delivery. (Tr. 32). Instead, law enforcement decided to set up surveillance at the 90 River Street address and wait for the package to arrive via postal delivery as originally scheduled so that they could track who received the package. (Tr. 9-10). Agent Walters testified that, in his experience, suspicious packages are "always going to a secondary residence" after arriving at a delivery address. (Id.). Commonly, the person who initially receives the package is compensated for collecting it, and then the package is sent off to a secondary location. (Id.). Agent Walters anticipated that someone would come and pick up the package after it was delivered. (Tr. 10). DEA agents worked with USPIS and Cattaraugus County Sheriff's Office to monitor the delivery and conduct surveillance. (Tr. 10-11).

On January 31, 2020, at approximately 9:12 a.m., the package was delivered to 90 River Street and left on the front porch of the residence. (Tr. 11). Soon thereafter, an individual exited the home and retrieved the package. (Id.). At approximately 9:52 a.m., that same individual was observed exiting the residence, carrying a white item, and entering the passenger compartment of gray SUV, later identified as a 2019 Nissan Rogue, which was parked in the driveway. (Tr. 11-12). That individual stayed in the vehicle a very short time, after which he exited and returned to the residence without the

white item he carried into the vehicle. (*Id.*). The Nissan Rogue then departed the area. (*Id.*).

Law enforcement personnel began following the Nissan Rogue after it left 90 River Street in Salamanca. (Tr. 12, 64). Deputy Yerpe testified that he was asked by CCSO Investigator Corey Higgins to assist in the investigation. (Tr. 63). He began following the Nissan Rogue in the Town of Salamanca as it entered Interstate 86 ("I-86") heading westbound. (Tr. 63, 69-70, 83). Investigator Higgins had already relayed to Deputy Yerpe that the vehicle was failing to maintain its lane. (Tr. 64). Deputy Yerpe got behind the vehicle, verified that it was indeed the vehicle agents were following, and he followed it for some time. (Id.). During that time, he personally observed that it was "driving erratically […] back and forth inside the driving lane of I-86." (*Id.*). There were lane markings on I-86, including a solid fog line, a dotted line between the two driving lanes, and a yellow line on the passing lane. (*Id.*). The vehicle was "veer[ing] over, sometimes just touching and sometimes actually crossing over one the white solid line." (*Id.*). Deputy Yerpe observed the vehicle crossing the lines at least three times. (*Id.*). From his observations, he believed the driver of the vehicle had committed a violation of state vehicle and traffic law, namely, failure to maintain lane. (Tr. 64-65).

Based upon his observations and the observations relayed to him by other officers, Deputy Yerpe initiated a traffic stop of the Nissan Rogue vehicle on I-86 westbound in the Town of Randolph. (Tr. 65, 82; Ex. 6). Deputy Yerpe's interaction with the driver of the vehicle was recorded with his body camera and a copy of the recording was admitted into evidence. (Tr. 66; Ex. 12-C). There was one occupant in the vehicle, identified as defendant Eddie Ortiz-Ortiz. (Ex. 65; Ex. 12-C). When Deputy Yerpe approached the

vehicle, he explained why he had pulled defendant over and asked defendant why he was "hitting the lines" while driving. (Ex. 12-C). Defendant did not dispute that he was drifting or swerving. (*Id.*). Instead, he offered an explanation, appearing to indicate that he was trying to operate the speed control, lane sensor, or another driver-assist system in the vehicle. (Tr. 104-05, Ex. 12-C). Defendant stated that the vehicle was rented by his mother and did not belong to him.[2] (Ex. 12-C).

Deputy Yerpe also observed the odor of burnt marijuana coming from the vehicle and defendant admitted to having smoked marijuana within about an hour. (Tr. 65-66; Ex. 12-C). Defendant held up an ashtray from the cupholder of the vehicle and admitted there was a little bit of marijuana in the ashtray. (Ex. 12-C). Based on defendant's admission of recently using marijuana, Deputy Yerpe asked defendant to step out of the car so that he could conduct standard field sobriety tests. (Tr. 71, 107; Ex. 12-D). While the sobriety tests were performed, a K-9 drug-detection dog was brought to the scene to check for narcotics other than marijuana in the vehicle. (Tr. 72). The K-9 alerted to the presence of narcotics in a white board game box labeled "Sequence" located on the back seat of the vehicle.[3] (Dkt. No. 42).

Deputy Yerpe testified that defendant was not yet under arrest, but defendant was advised he was being detained and taken from the scene of the stop. (Tr. 92). Deputy

---

[2] Defendant submitted an affidavit of standing affirming that he was driving the gray 2019 Nissan Rogue vehicle bearing New Jersey license plate number H93LAC on the date of this incident. (Dkt. No. 27, ¶ 3). The Government has not contested this standing affidavit, therefore the Court assumes, for purposes of this motion, that defendant has standing to challenge the search of the vehicle.

[3] The Government and defense counsel have stipulated to the facts, including training and qualifications, relevant to the drug-sniffing dog used here. (Dkt. No. 42). They agree that Cattaraugus County Sheriff Deputy Timothy Pence and his K-9 "Nichols," responded to the traffic stop of defendant and Nichols positively alerted to the back seat of the Nissan Rogue vehicle. (*Id.*, ¶ 3). K-9 Nichols was trained to provide positive indications for cocaine, crack-cocaine, heroin, and methamphetamine; not marijuana. (*Id.*).

Yerpe transported defendant to the Cattaraugus County Sheriff's Office in Little Valley, New York and defendant's vehicle was towed to the same location. (Tr. 13, 92-93). Defendant was issued a traffic ticket pursuant to New York Vehicle and Traffic Law § 1123(a) for moving unsafely from a lane. (Ex. 6). Deputy Yerpe's allegations about this incident were recorded at the time in a supporting deposition. (Ex. 9).

At approximately 12:01 p.m., defendant was questioned by Agent Walters and other officers at the Sheriff's Office. (Tr. 13-16). The interview was videorecorded and admitted into evidence. (Ex. 12-A). Agent Walters testified that, prior to speaking with defendant, he read defendant his *Miranda* rights from a DEA-13 form which the agent had in his wallet. (Tr. 13; Exs. 3, 12-A). After Agent Walters advised defendant of his *Miranda* rights, he asked him "okay?" and the defendant nodded. (Tr. 13-14, 17; Ex. 12-A). Agent Walters understood defendant's nod to mean that defendant understood those rights. (*Id.*). He would not have continued the interview if defendant had indicated "no." (Tr. 56). At no time during this interview did the defendant invoke his right to counsel. (Tr. 18, 56). Defendant spoke English during the interview. (Tr. 56). Agent Walters was aware that defendant was born in Puerto Rico. (Tr. 47). During the interview, defendant stated that all the items in the vehicle belonged to him. (Tr. 18).

During this time, law enforcement personnel also applied for a warrant to search defendant, the Nissan Rogue vehicle, and any packages and containers inside the vehicle. (Tr. 20, Ex. 7). The search warrant was issued by Cattaraugus County Judge Ronald Ploetz on January 31, 2020. (Ex. 8). After obtaining the warrant, law enforcement searched the vehicle and opened the cellophane-wrapped "Sequence" board game box located in the back seat. (Tr. 21). The box was not opened prior to law enforcement

6

obtaining the search warrant. (*Id.*). Found inside the box was a rectangular item wrapped in black and clear tape which was determined to contain cocaine. (Tr. 21-23; Exs. 4-A, 4-B). A small bag of marijuana was also found in the vehicle. (Tr. 23; Ex. 4-C).

At approximately 3:18 p.m., after searching the vehicle and discovering narcotics inside the game box, law enforcement conducted a second interview of defendant. (Tr. 23-24). The interview was video recorded and admitted into evidence. (Ex. 12-B). Before the questioning began, Agent Walters told defendant that he was formally under arrest, and he advised defendant again of his *Miranda* rights. (Tr. 23-25; Ex. 12-B). During this interview, defendant requested an attorney. (Tr. 25-26). Agent Walter and the other officers then stopped their interrogation of defendant. (*Id.*).

It is noted that after having the opportunity to listen to Agent Walters and Deputy Yerpe and observe their demeanors during the hearing, the Court finds each of them to be wholly credible. Defendant did not testify or present any evidence during the suppression hearing. In support of his motions to suppress, defendant submitted an affidavit contesting that he committed any vehicle or traffic violations prior to the traffic stop. (Dkt. No. 27, ¶ 4). Therein, he asserts that when he was operating the vehicle on I-86 headed west from Salamanca to Jamestown he "did not speed or fail to maintain [his] proper driving lane." (*Id.*, ¶ 3-4). He disputes that there were any "double lines" or road markings on that section of I-86. Defendant submits that his vehicle was equipped with sensors that would self-correct and prevent the vehicle from deviating from its lane. (*Id.*). Defendant further alleges that, after being stopped, police officers accused him of having drugs. (*Id.*, ¶ 5). He did not consent to a search of his vehicle. (*Id.*). He asserts that he was taken to the Sheriff's Department in Little Valley, New York, where he was questioned

by officers. (*Id.*, ¶ 6). He states that he was "scared, confused and not understanding some of their questions and at one point [he] told them that [he] wanted to talk to [his] attorney." (*Id.*). He states that officers then left the room and returned to question him again. (*Id.*).

The credible, detailed, and live testimony of Deputy Yerpe and Agent Walters, which was subject to cross-examination, plainly contradicts the claims made in defendant's affidavit. First, Deputy Yerpe's testimony is clear regarding his personal observation of a traffic violation (failure to maintain lane) committed by defendant while operating the vehicle. He also testified as to lane markings present on I-86 in the area the violation was observed. The body camera footage and supporting deposition from the traffic stop are consistent with Deputy Yerpe's testimony. Second, Agent Walters testified that during the first custodial interrogation, defendant did not ask for questioning to stop or invoke his right to counsel. He testified that it was only during the second interrogation that defendant requested to speak with an attorney. Agent Walters swore that questioning stopped at that time. The video recordings from the interviews are consistent with Agent Walters' testimony.

Thus, the Court declines to credit the self-serving statement in defendant's affidavit that he did not commit a traffic violation and that he was questioned after invoking his right to counsel. *See DiMattina v. United States*, 949 F. Supp. 2d 387, 411 (E.D.N.Y. 2013) ("Without the threat of cross-examination, [the defendant's] affidavits are viewed as self-serving and given little weight."); *United States v. Polanco*, 37 F. Supp. 2d 262, 264 n. 4 (S.D.N.Y. 1999) ("[T]he self-serving affidavit of the moving defendant is usually disregarded if he declines to testify at the hearing."); *United States v. Murray*, 6:14-CR-

06183, 2015 U.S. Dist. LEXIS 162846, *12 (W.D.N.Y. Dec. 4, 2015) (declining to credit defendant's affidavit indicating that his statements to officers were involuntary and the product of interrogation because the defendant was not subjected to cross-examination and the hearing testimony did not support his version of events).

## CONCLUSIONS OF LAW

### MOTION TO SUPPRESS PHYSICAL EVIDENCE

Defendant moves to suppress all evidence derived from the traffic stop and his arrest on January 31, 2020, on the basis that the seizure was unlawful. (Dkt. No. 22, ¶¶ 3-9). He argues that officers obtained custody of the vehicle as a direct result of his warrantless arrest, which he believes was executed in the absence of probable cause. (*Id.*). Defendant further contends that the subsequent searches and warrant(s) issued are subject to suppression as derivative or "second generation" evidence of illegally obtained information. (*Id.*). Defendant also moves to suppress evidence seized pursuant to the warrant executed upon the 2019 Nissan Rogue. (*Id.*, ¶¶ 10-16). Finally, defendant moves to suppress all evidence gained from the allegedly unlawful arrest, including post-arrest statements, documents, and items seized, as fruit of the poisonous tree. (*Id.*, ¶¶ 21-25). For the reasons that follow, the Court concludes that the seizure of defendant and search of his vehicle were lawful and there is no reason to suppress evidence gained directly or derivatively from those actions.

### *Probable Cause Supported the Traffic Stop and Subsequent Arrest*

"An ordinary traffic stop constitutes a limited seizure within the meaning of the Fourth and Fourteenth Amendments." *United States v. Hasan El*, 5 F.3d 726, 729 (4th Cir. 1993) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). The Fourth Amendment

requires that an officer making a traffic stop have probable cause or reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity. *United States v. Stewart*, 551 F.3d 187, 191 (2d Cir. 2009); *see Terry v. Ohio*, 392 U.S. 1, 20 (1968). In evaluating the validity of a stop, the Court must consider the totality of the circumstances. *United States v. Sokolow*, 490 U.S. 1, 8 (1989). Evidence seized as a result of an illegal stop is subject to the fruit of the poisonous tree doctrine. *Hassan El*, 5 F.3d at 729 (citing *Wong Sun v. United States*, 371 U.S. 471 (1963)).

Here, the stop of defendant was lawful based on the specific and articulable fact of his observed traffic violation. *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir. 1994) (holding that observed violation of state traffic law, although minor, gave authority for officers to stop defendant). The evidence shows that Cattaraugus County Sheriff's Deputy Joseph Yerpe observed defendant violate New York Vehicle and Traffic laws when defendant's vehicle unsafely crossed over the marked roadway lines while driving on I-86. *See* NY CLS Veh & Tr § 1128(a) ("A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.").[4] Accordingly, Deputy Yerpe had probable cause to initiate a stop of the vehicle. *See United States v. Lloyd*, 17-CR-119, 2018 U.S. Dist. LEXIS 109448, at *11-12 (W.D.N.Y. Apr. 9, 2018) (finding probable cause for traffic stop where officer observed at least one traffic violation). In fact,

---

[4] The Government also relies on the collective knowledge doctrine, which "allows a court to impute an officer's knowledge to another officer who actually makes a stop or conducts a search, even if the latter does not possess all the relevant facts." *Lloyd*, 2018 U.S. Dist. LEXIS 109448, at *16 (citing *United States v. Hussain*, 835 F.3d 307, 3016 n.8 (2d Cir. 2016)). Probable cause to stop defendant was also present based on evidence that other officers witnessed that defendant's vehicle was failing to maintain its lane and that information was relayed to Deputy Yerpe.

after being stopped, the defendant did not deny that he had drifted from his lane or driven erratically. Instead, the evidence shows that defendant tried to explain to Deputy Yerpe why he may have left his lane – gesturing and describing the vehicle's driver-assist features which he had been trying to operate. Defendant was issued a ticket for violating the traffic law, which further supports the legitimacy of the initial stop.

Defendant appears to argue that the traffic stop was pretextual. However, the argument lacks merit considering clear evidence that a traffic violation was observed. It is well-established that an officer's pretextual use of a traffic violation does not render a stop constitutionally unreasonable. *See Whren v. United States*, 517 U.S. 806, 813 (1976) (holding that constitutional reasonableness of traffic stops does not depend on the actual motivations of the individual officers involved); *United States v. Dhinsa*, 171 F.3d 721, 724-25 (2d Cir. 1998) ("an officer's use of a traffic violation as a pretext to stop a car in order to obtain evidence for some more serious crime is of no constitutional significance"). Here, regardless of the subjective intent of Deputy Yerpe, or any other officer involved, probable cause existed to make a traffic stop. An otherwise valid stop "does not become unreasonable merely because the officer has intuitive suspicions that the occupants of the car are engaged in some sort of criminal activity." *Scopo*, 19 F.3d at 784; *see also United States v. Williams*, 453 Fed. Appx. 74, 77 (2d Cir. 2011) (summary order) ("even if [defendant] could demonstrate that the stop was pretextual, as long as the officer had probable cause to believe a traffic violation occurred, whether the officer had an 'ulterior motive' is irrelevant to the Fourth Amendment analysis"); *United States v. Wofford*, 19-CR-6061, 2021 U.S. Dist. LEXIS 5587, at *55-56 (W.D.N.Y. Jan. 11, 2021) ("Although the hearing testimony certainly suggests that [officers] were surveilling the [defendant's

vehicle] with the intent of stopping it in the event that a traffic violation occurred, [the Court] disagree[s] that such an intent renders the stop unlawful.").

Following the traffic stop, defendant was detained by Officer Yerpe and taken to the Cattaraugus County Sheriff's Office for further investigation. His vehicle was seized and, after obtaining a search warrant, it was searched and found to contain both cocaine and marijuana. Defendant was formally placed under arrest at that time. Defendant broadly challenges the constitutionality of his arrest because "officers did not find any cocaine until after defendant's arrest and the search of the Nissan vehicle." (Dkt. No. 22, ¶ 24).

Reviewing the investigative activity during the traffic stop and defendant's subsequent arrest, the Court finds no constitutional defect in the conduct of law enforcement. It is well-established that "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender," even in the absence of a warrant. *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001); *see also Scopo*, 19 F.3d at 781. Here, the traffic violation observed by Deputy Yerpe was sufficient probable cause to arrest defendant. *See United States v. White*, 298 F. Supp. 3d 451, 458 (E.D.N.Y. 2018) (finding probable cause for stop and arrest where defendant committed a traffic infraction and had a suspended license). Furthermore, when Deputy Yerpe approached defendant's vehicle to effectuate the stop, he observed the scent of marijuana. Defendant then admitted that he had used marijuana within the hour and that he had a small amount of marijuana in the vehicle.[5] Deputy Yerpe's performance of a field sobriety test, and the

---

[5] To be clear, officers did not search defendant's vehicle until they had obtained a search warrant, but they would have been justified in doing so if they had. The smell of marijuana emanating from a vehicle

use of a drug-sniffing police dog on the vehicle, were warranted under the circumstances.[6] *See United States v. Kendrick*, 2015 U.S. Dist. LEXIS 64074, at *21-22 (W.D.N.Y. May 15, 2015) (quoting *United States v. Foreste*, 780 F.3d 518, 523 (2d Cir. 2015)) ("[a] traffic stop may be extended for investigatory purposes if an officer develops a reasonable suspicion of criminal activity supported by specific and articulable facts"). Defendant's admission of marijuana possession and the canine's alert to the presence of narcotics other than marijuana in the vehicle each gave rise to independent probable cause to believe that contraband or other evidence of a crime would be found in the vehicle. The detention and later arrest of defendant were permissible under the totality of the circumstances. *See United States v. Rivera*, 89 F. Supp. 3d 376, 415 (E.D.N.Y. 2015) (canine alert to the presence of drugs in vehicle, along with other indicia of criminal activity, create probable cause for arrest).

### Reasonable Suspicion Regarding Package Delivery to 90 River Street

In the alternative to the finding of probable cause for the traffic stop, the Court concludes that law enforcement also had reasonable suspicion that the package addressed to 90 River Street contained illegal narcotics or other contraband based on the observations of USPIS agents. That suspicion enabled agents to establish surveillance

---

provides officers with reasonable suspicion to investigate a suspect's activities and probable cause to search a vehicle. *See United States v. Wofford*, 19-CR-6061, 2021 U.S. Dist. LEXIS 5587, at *56-57 (W.D.N.Y. Jan. 11, 2021) (collecting cases); *see generally United States v. Gaskin*, 364 F.3d 438, 456 (2d Cir. 2004) (under the automobile exception to the warrant requirement, police may conduct a warrantless search of a readily mobile vehicle if probable cause exists to believe the vehicle contains contraband or other evidence of a crime).

[6] Although not addressed by defendant, the Government argues, and the Court agrees, that the use of the drug-sniffing dog did not unreasonably prolong this traffic stop and the facts here are readily distinguishable from those addressed in *Rodriguez v. United States*, 575 U.S. 348 (2015).

at 90 River Street and it supported a temporary investigatory stop of defendant's vehicle when he was believed to be in possession of the package.

Police may stop and briefly detain a person for investigative purposes if the officer has reasonable suspicion supported by articulable facts that criminal activity "may be afoot," even if the officer lacks probable cause. *Sokolow*, 490 U.S. at 7 (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). The Fourth Amendment imposes "some minimal level of objective justification" to validate a detention or seizure. *INS v. Delgado*, 466 U.S. 210, 216-17 (1984). The Supreme Court has described the reasonable suspicion standard as requiring officers to have a "particularized and objective basis for suspecting the particular person" of a crime. *See United States v. Montoya De Hernandez*, 473 U.S. 531, 541-42 (1985). In the case of narcotics trafficking, an officer's suspicion is deemed reasonable "if the conduct as a whole would appear suspect to one familiar with the practices of narcotics couriers, albeit the pattern of behavior is innocuous to the untrained observer." *United States v. Villegas*, 928 F.2d 512, 516 (2d Cir. 1991) (quoting *United States v. Ramirez-Cifuentes*, 682 F.2d 337, 342 (2d Cir 1982)).

Reasonable suspicion about the contents of a package may be established by examining factors relevant to what United States Postal Inspectors refer to as a "drug smuggling profile." *See United States v. Martinez*, 869 F. Supp. 202, 203 (S.D.N.Y. 1994) (applying *Terry* doctrine to support seizing and detaining, for further investigation, packages which fit a "drug smuggling profile"). Elements that fit this profile include: "(1) package heavily wrapped in tape and attempt made to seal all openings; (2) hand printed or written labels; (3) unusual return name and address; (4) unusual odor coming from the package; [and] (5) fictitious return address." *Id.*, at 203, n.2. Postal inspectors also

consider whether the package originates from, or is being sent to, "a source city or a destination city" for illegal drugs. *Id*.

Here, USPIS had reasonable suspicion to investigate the package addressed to 90 River Street because the item contained elements fitting the drug smuggling profile. Postal inspectors identified that the sender's name and the writing on the address label were consistent with previous packages that had been seized and found to contain cocaine. The evidence also shows that the package had a handwritten label and did not contain a recipient name. Surveillance of the package after its delivery to 90 River Street revealed that the package was received by one individual and then placed in the vehicle driven by defendant. Based upon the observations of USPIS and DEA agents, the temporary stop of defendant's vehicle to further investigate ongoing criminal activity connected to the package was lawful and reasonable. As explained above, as soon as the vehicle was stopped on I-86, Deputy Yerpe's observations, defendant's admissions about marijuana, and the positive canine alert developed into probable cause sufficient to justify further investigation and detention of defendant.

### *Probable Cause Supported the Search Warrant*

Defendant's 2019 Nissan Rogue vehicle was not searched during the traffic stop. Instead, defendant was transported to the Cattaraugus County Sheriff's Office and the vehicle was towed to the same location. While Agent Walters interviewed defendant, law enforcement personnel applied for a warrant to search defendant, the vehicle, and any packages and containers inside the vehicle. The search warrant was issued by Cattaraugus County Judge Ronald Ploetz on January 31, 2020. Only after obtaining the warrant did law enforcement search the vehicle. During that search, they found a quantity

of cocaine inside a "Sequence" board game box located in the back seat, as well as a small bag of marijuana.

Defendant challenges the issuance of this search warrant on the grounds that the application for the warrant included allegations based on the "observation of defendant at the River Street address in Salamanca, NY, and the investigation up to the point that led Law Enforcement to the said River Street address [...]." (Dkt. No. 22, ¶ 4). To the extent defendant is challenging information contained in the application from the underlying traffic stop and observations made therein, the above analysis establishes there was no constitutional violation, and thus, no basis for suppression. Further, defendant's allegations of illegally obtained information or bad faith misrepresentations are unfounded.

Upon a challenge to a probable cause finding made in a search warrant, a reviewing court must give deference to the issuing judge. *Illinois v. Gates*, 462 U.S. 213, 236 (1969). The court is not to conduct a *de novo* review nor is it to "interpret[] affidavit[s] in a hypertechnical, rather than a commonsense, manner." *Id.* Instead, the role of a reviewing court "is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *Id.* at 238 (internal citations omitted). The probable cause analysis is based on the totality-of-the-circumstances, with the task of the issuing magistrate to "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him [...] there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* Where, as here, the Court is reviewing the probable cause determination of an independent magistrate, it asks solely "whether the issuing judicial officer had a substantial basis for the finding of

probable cause." *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993). Doubts regarding the existence of probable cause should be resolved in favor of upholding the search warrant. *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983). To that end, warrant affidavits are entitled to "a presumption of validity." *Franks v. Delaware*, 438 U.S. 154, 171 (1978).

The Supreme Court has held that a defendant is entitled to an evidentiary hearing with respect to the validity of a search warrant only if they can make a substantial preliminary showing that: (1) the warrant affidavit contained a false statement; (2) the false statement was included intentionally or recklessly; and (3) the false statement was integral to the probable cause finding. *Franks*, 438 U.S. at 155-56. In other words, to justify a *Franks* hearing "a defendant is required to show: (1) 'that there were intentional and material misrepresentations or omissions' in the warrant affidavit, and (2) that the 'alleged falsehoods or omissions were necessary to the ... probable cause finding.'" *United States v. Mandell*, 752 F.3d 544, 552 (2d Cir. 2014) (quoting *United States v. Awadallah*, 349 F.3d 42, 65 (2d Cir. 2003)). Further, the Second Circuit has held that "[i]f, after setting aside the allegedly misleading statements or omissions, the affidavit, nonetheless, presents sufficient information to support a finding of probable cause, the district court need not conduct a *Franks* hearing." *United States v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998).

Applying this standard of review, the Court has reviewed the search warrant and warrant application and finds that probable cause existed for its issuance. Further, the Court sees no basis for a *Franks* hearing. Defendant does not reference any deliberate or recklessly false or misleading information in the search warrant. Indeed, defendant has

not raised any points which constitute a material omission or false statement under *Franks*. For these reasons, the Court recommends that defendant's motion to controvert this search warrant and suppress the evidence derived therefrom should be denied.[7]

### *No Basis to Suppress Derivative Evidence*

Based on the above findings, the Court finds no reason to suppress evidence derived from the traffic stop, arrest, or the subsequent search of defendant's vehicle. In sum, the Court recommends that defendant's motion to suppress physical evidence be denied in its entirety.

### MOTION TO SUPPRESS STATEMENTS

Defendant moves to suppress evidence of statements he made to law enforcement during custodial interrogations on January 31, 2020. (Dkt. No. 22, ¶¶ 17-20). He contends that the statements "were taken involuntarily, or in violation of defendant's right to counsel or right to remain silent, or otherwise in violation of defendant's constitutional rights." (*Id.*, ¶ 18). Defendant further asserts that his statements were obtained without "adequately advising defendant of his 'Miranda' rights prior to questioning" and without a knowing, voluntary, or intelligent waiver of those rights. (*Id.*, ¶ 20). For the reasons that follow, the Court concludes there is no basis to suppress these statements.

---

[7] Defendant's motion to suppress should also be denied based on the "good faith exception" established in *United States v. Leon*, 468 U.S. 897 (1984). Under *Leon*, evidence seized pursuant to a challenged warrant is not subject to suppression so long as law enforcement acted with objective and reasonable good faith, even if the judicial officer erred in finding probable cause. *Id.* at 922. Here, there is no evidence that any officer intended to mislead the magistrate, and the Court finds that the law enforcement officers who executed the search warrant had a good faith basis to believe that the warrant was lawfully issued based upon a finding of probable cause. The warrant application certainly was "not 'so lacking in indicia of probable cause' that it was unreasonable for the officers to rely upon" them. *United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992) (quoting *Leon*, 468 U.S. at 923). Thus, defendant's motion to suppress may also be denied on this alternative ground.

*Defendant Knowingly and Voluntarily Waived his Miranda Rights*

A suspect in custody must be advised prior to any questioning "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). "Even absent the accused's invocation of [his *Miranda* rights], the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [*Miranda*] rights' when making the statement." *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (second alteration in original) (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)). Here, the parties do not dispute that defendant made statements in the context of a custodial interrogation. The issues before the Court are whether defendant was administered his *Miranda* rights and whether he knowingly and voluntarily waived those rights when making statements.

"To prove a valid waiver, the government must show (1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right." *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995). "Only if the totality of the circumstances 'reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.'" *United States v. Male Juvenile*, 121 F.3d 34, 40 (2d Cir. 1997) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). "[W]aiver need not be express." *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011). So long as "the prosecution shows that a *Miranda* warning was given and that it was

understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Berghuis*, 560 U.S. at 384. The government must prove waiver by a preponderance of the evidence. *See United States v. Gaines*, 295 F.3d 293, 297 (2d Cir. 2002).

To satisfy the Fifth Amendment, a suspect does not need to know and understand every possible consequence of a waiver. *See Moran*, 475 U.S. at 422. A waiver is made knowingly and intelligently if the defendant has a "full awareness of both the nature of the right being abandoned and the consequence of the decision to abandon it." *See id.*, at 421. The Government must prove the validity of a waiver by showing that the accused knew he could choose not to talk to law enforcement, to talk only with counsel present, or discontinue talking at any time. *See Colorado v. Spring*, 479 U.S. 564, 574 (1987).

The Government must also demonstrate that defendant's *Miranda* waiver was made voluntarily. For waiver to be voluntary, it must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran*, 475 U.S. at 421. Voluntariness is based upon the totality of the circumstances and includes an inquiry as to: "(1) the characteristics of the accused; (2) the conditions of the interrogation; and (3) the conduct of law enforcement officials." *Green v. Scully*, 850 F.2d 894, 900 (2d Cir. 1988). More specifically, the factors "include the accused's age, his lack of education or low intelligence, the failure to give *Miranda* warnings, the length of detention, the nature of the interrogation, and any use of physical punishment. *Campaneria v. Reid*, 891 F.2d 1014, 1020 (2d Cir. 1989). Overall, the voluntariness inquiry considers "whether a defendant's will was overborne" by the circumstances surrounding the giving of a

confession. *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 223 (1973)).

The facts established at the hearing demonstrate that defendant was given a *Miranda* warning prior to questioning and that he waived those rights before making statements. Indeed, the evidence shows that Agent Walters recited a *Miranda* warning to defendant on two occasions, prior to the start of each of two custodial interviews on January 31, 2020. Defendant was read his *Miranda* rights prior to the first interview, at which time Agent Walters asked, "okay?" and defendant responded by nodding his head. This exchange indicates that defendant acknowledged he understood those rights. Affirmative nods have been upheld as valid indications that defendants understand their constitutional rights. *United States v. Islam*, 04-CR-305, 2006 U.S. Dist. LEXIS 24846, at *19 (D. Conn. Apr. 28, 2006) (finding waiver where defendant indicated he understood his rights by nodding his head); *see also Jenkins v. Leonardo*, 991 F.2d 1033, 1034-38 (2d Cir. 1993) (holding that defendant validly waived his right to counsel when he nodded to indicate that understanding of rights). Defendant then went on to make statements, including, *inter alia*, that all the items in the vehicle belonged to him. Where, as here, the Government shows that they gave defendant his *Miranda* warnings and that he understood those warnings, the defendant's uncoerced statement establishes an implied waiver of the right to remain silent. *Berghuis*, 560 U.S. at 384; *see also United States v. Tutino*, 883 F.2d 1125, 1138 (2d Cir. 1989) (finding that defendant who nodded his head and answered "yes" when asked if he understood his rights prior to his confession had waived his *Miranda* rights). Further, there is no factual dispute that during the second

interview (which followed execution of the search warrant for the vehicle) defendant invoked his *Miranda* rights and law enforcement ceased all questioning.

In determining voluntariness, the Court must also examine the characteristics of the defendant. Here, defendant is an adult of average intelligence. Although he was born in Puerto Rico, he spoke and conversed in English. Even if the defendant had limitations on his English language skills, of which there is no evidence here, that would not preclude his knowing and voluntary waiver of *Miranda* rights. *See United States v. Shabani*, 12-CR-454, 2012 U.S. Dist. LEXIS 158600, at *13-14 (E.D.N.Y. Nov. 5, 2012). The video recording shows that defendant was lucid and coherent during the questioning. Further, there is no evidence that conditions of the interrogation were coercive in manner, nor that the conduct of law enforcement was unlawful. Defendant makes no claim that agents used physical force, threats, or promises of any kind to convince him to speak with them.

Accordingly, based on the totality of the circumstances described above, the Court finds that defendant knowingly, intelligently, and voluntarily relinquished his *Miranda* rights prior to making statements during the first custodial interrogation. It is thus recommended that defendant's motion to suppress his statements be denied.

## OMNIBUS DISCOVERY DEMANDS

### *Preclusion of Identification Evidence*

Defendant moves to preclude the Government from introducing evidence of pretrial identifications of defendant by witnesses to the extent the Government has not already provided notice of such identification evidence under Rule 12(b) of the Federal Rules of Civil Procedure. (Dkt. No. 22, ¶¶ 26-28). The Government submits that it does not intend

to introduce evidence of any pretrial identifications of the defendant. (Dkt. No. 25, pg. 13). In light of the above, the Court denies defendant's request as moot.

*Limit Cross-Examination*

Defendant seeks an order limiting the admissibility of prior crimes or "bad act" evidence which the Government may seek to introduce under Rules 404(b) or 609 of the Federal Rules of Civil Procedure. (Dkt. No. 22, ¶¶ 29-31).

The Government states that it will provide reasonable notice in advance of trial of the general nature of prior uncharged crimes that it intends to use at trial under Rule 404(b). (Dkt. No. 25, pgs. 13-14). It further submits that it has no obligation to provide pre-trial notice of impeachment evidence under Rules 608 and 609 and will address same in its pre-trial memorandum to the District Court. The Government indicates it will provide this information when directed by the trial judge.

The Government is required to provide "reasonable notice in advance of trial" of the general nature of prior uncharged crimes or bad acts it intends to introduce against a defendant. *See* Fed. R. Evid. 404(b). Rule 608 of the Federal Rules of Evidence does not contain the same pretrial notice requirement. Based upon the Government's representation that it will disclose bad act or impeachment evidence prior to trial, defendant's motion, to the extent it constitutes a motion for disclosure, is denied as moot. The Court instructs that any disclosure should be done in accordance with the District Court's pretrial order. Further, defendant's motion to limit cross-examination is denied without prejudice to renewal. The issue of admissibility of evidence pursuant to Federal Rules of Evidence 404(b), 608 and 609 is left to the determination of the District Court at the time of trial.

*Rule 16 Discovery and Expert Witnesses*

Defendant moves for discovery pursuant to Rule 16 of the Federal Rules of Criminal Procedure, which requires that the Government disclose evidence and information upon request of a defendant. (Dkt. No. 22, ¶¶ 32-34; 35-39). While Rule 16 was intended to provide for liberal discovery, a defendant is not entitled to discovery of "the entirety of the Government's case against him." *United States v. Percevault,* 490 F.2d 126, 130 (2d Cir. 1974). Rule 16 provides that a defendant is entitled to the following: (1) a defendant's written, recorded or oral statements in the possession of the Government; (2) the defendant's prior record; (3) documents, objects, books, papers, photographs, etc. that will be used during the Government's case-in-chief; (4) reports of examinations or tests; (5) and information about expert witnesses in accordance with Federal Rules of Evidence 702, 703 and 705. *See* Fed. R. Crim. P. 16(a)(1). Rule 16 specifically exempts from disclosure "reports, memorandum, or other internal Government documents made by an attorney for the Government or other Government agent in connection with investigating or prosecuting the case." *See* Fed. R. Crim. P. 16(a)(2).

Here, defendant has specifically requested expert witness information, transcripts of witness testimony before the grand jury, and surveillance photographs from the investigation.[8] Defendant's request for grand jury transcripts is addressed separately below. The Government submits that it has provided defendant with all requested items, in its possession, that are relevant to this case and discoverable pursuant to Rule 16. Based upon the representations made by the Government, including that it will continue

---

[8] Defendant also moves for disclosure of the identity of confidential informants who were "present with defendant or codefendant Ross [...]." (Dkt. No. 22, ¶ 36). The request is inapplicable to the facts of this case, and it appears it was made in error. Accordingly, the Court denies the request as moot.

to provide discoverable evidence as it becomes available, the Court finds that the Government has complied with Rule 16. The Court therefore denies defendant's request as moot. The Government is reminded that its disclosure obligations continue up through and during trial. *See* Fed. R. Crim. P. 16(c).

*Grand Jury Testimony*

Defendant requests production of grand jury transcripts but puts forth no particular grounds for the requests. (Dkt. No. 22, ¶ 38). The Government opposes this request on the grounds that defendant has not demonstrated particularized need for such disclosure. (Dkt. No. 25, pgs. 15-16). The burden is on the defense to show that "a particularized need" exists for the minutes which outweighs the policy of secrecy. *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 400 (1959). An indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence. *United States v. Calandra*, 414 U.S. 338, 345 (1974). A defendant is not entitled to inspect grand jury minutes and evidence without producing "concrete allegations of Government misconduct." *United States v. Leung*, 40 F.3d 577, 582 (2d Cir. 1994). Defendant has not made any such allegations here. Therefore, to the extent that defendant requests grand jury material that is not also 3500, *Brady* or *Giglio* material, the motion is denied.

*Disclosure of Brady Material*

Defendant moves for the disclosure of any favorable, exculpatory or impeachment materials pursuant to *Brady*, *Giglio* and their progeny.[9]  (Dkt. No. 22, ¶¶ 40-42). "[A]s a general rule, *Brady* and its progeny do not require immediate disclosure of all exculpatory

---

[9] *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972).

and impeachment material upon request by a defendant." *United States v. Coppa*, 267 F.3d 132, 146 (2d Cir. 2001). "[A]s long as a defendant possesses *Brady* evidence in time for its effective use, the Government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner." *Id.* at 144.

The Government submits that it is mindful of its obligations under *Brady* and its progeny. (Dkt. No. 25, pgs. 16-18). The Government that it will disclose any exculpatory information, if and when it becomes aware of it. The Government agrees to provide impeachment material, namely, promises of leniency or immunity agreements with witnesses, criminal records of witnesses, immoral or criminal acts committed by witnesses, and prior inconsistent statements, prior to the commencement of trial and when the Government produces *Jencks Act* material. Given the Government's representations, defendant's motion to compel the production of *Brady/Giglio* material is denied. Consistent with *Coppa*, the Government is reminded of its continuing obligation to timely disclose any *Brady* and *Giglio* material to defendant.  *See United States v. Padovani*, No. 14-CR-00224, 2016 WL 5402696, at *4 (WDNY Sept. 28, 2016).

<u>*Early Disclosure of Witnesses and Jencks Act Materials*</u>

Defendant moves for the disclosure of witness names and statements prior to trial. (Dkt. No. 22, pgs. ¶¶ 43). The Government has no general duty to disclose the identities of its witnesses before trial. *United States v. Bejasa*, 904 F.2d 137, 139 (2d Cir. 1990). Section 3500 of Title 18 of the United States Code requires that the Government, on motion of defendant, disclose a Government witness's prior statements that are in the Government's possession and relate to the subject matter of the witness's direct testimony. *See also Jencks v. United States*, 353 U.S. 657 (1957); Fed. R. Crim. P. 26.2

(procedure for producing a witness statement). A witness statement is defined as: (1) a written statement by a witness that is signed or otherwise adopted or approved by the witness; (2) a substantially verbatim recording or transcription of a witness's oral statement; or (3) any statement however taken or recorded made by the witness to the grand jury. 18 U.S.C. 3500(e). Statements are not required to be produced, by law, until after the witness has testified on direct examination, and the Court cannot mandate that they be produced sooner. *See* 18 U.S.C. §3500(a); Fed. R. Crim. P 26.2(a).

Here, the Government indicates that, in advance of trial and in accordance with the District Judge's pretrial order, it will produce all material required by the *Jencks Act.* (Dkt. No. 25, pg. 18). The Government further indicates that it will disclose its witness list when ordered to do so by the District Court. In light of these representations, defendant's request for witness names and early disclosure of *Jencks* Act material is denied.

<u>Leave to File Additional Motions</u>

Defendant also moves to preserve his right to make further and additional motions. (Dkt. No. 22, ¶¶ 44-46). To the extent defendant intends to bring motions based upon new rulings, information or evidence, his request for leave to file additional motions is granted. To the extent defendant intends to bring motions concerning issues that could have been raised prior to the previous motion deadline, defendant's request is denied without prejudice to bringing the motion upon a showing of good cause for the untimely filing.

## CONCLUSION

For the foregoing reasons, it is recommended that defendant's motions to suppress physical evidence and custodial statements be denied. (Dkt. No. 22). It is ordered that defendant's omnibus discovery demands are decided in the manner detailed above.

Pursuant to 28 U.S.C. §636(b)(1), it is hereby ordered that this Report, Recommendation and Order be filed with the Clerk of Court.

Unless otherwise ordered by Judge Sinatra, any objections to the recommendations portion of this Report, Recommendation and Order must be filed with the Clerk of Court within fourteen days of service of this Report, Recommendation and Order in accordance with the above statute, Rules 59(b), 45(a), and 45(c) of the Federal Rules of Criminal Procedure, and Local Rule of Criminal Procedure 59.  Any requests for an extension of this deadline must be made to Judge Sinatra.

***Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report, Recommendation and Order WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.*** *See Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. *See* <u>*Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 990-91 (1st Cir. 1988)*</u>.

*Pursuant to Local Rule of Criminal Procedure 59(c)(2), written objections "shall specifically identify the portions of the proposed findings and recommendations to which*

objection is made and the basis for each objection, and shall be supported by legal authority." **Failure to comply with these provisions may result in the District Court's refusal to consider the objection.**


   **SO ORDERED**.


  Dated: February 1, 2022
     Buffalo, New York

             _____
             MICHAEL J. ROEMER
             United States Magistrate Judge